## NIX v. UNITED STATES. *

(Circuit Court of Appeals, Ninth Circuit. March 9, 1925. Rehearing Denied April 9, 1925.)

No. 4365.

1. **Post office** ⟜50—Evidence that accused participated in fraudulent scheme, and used mails in furtherance thereof, held sufficient to go to jury.

Evidence that accused participated in fraudulent oil well scheme, and used mails in furtherance thereof, in violation of Penal Code, § 215 (Comp. St. § 10385), *held* sufficient to go to jury.

2. **Judgment** ⟜751—That employé who wrote and signed letters at accused's instance was acquitted held not to affect question of accused's guilt of using mails to defraud.

Where letter in furtherance of fraudulent scheme was written and mailed at accused's instance, fact that employé who wrote and signed letter was acquitted of using mails to defraud, in violation of Penal Code, § 215 (Comp. St. § 10385), did not affect question of accused's guilt.

3. **Criminal law** ⟜422(1)—Letters signed by others than accused held properly admitted against all persons involved in conspiracy to use mails to defraud.

Where evidence strongly tended to show unlawful combination to defraud by use of mails, letters signed by accused's co-conspirators were properly admitted against all persons involved therein, especially where instructions correctly stated law respecting accused's responsibility for letters not mailed or signed by him.

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Benjamin F. Bledsoe, Judge.

Wyatt L. Nix was convicted of having devised a scheme to defraud and of using mails in furtherance thereof, in violation of Penal Code, § 215, and he brings error. Affirmed.

*Rehearing denied April 15, 1925.

Nix, with five others, was indicted in nine counts for having devised a scheme to defraud, and having used the mails in furtherance of the scheme. Section 215, Penal Code (Comp. St. § 10385). Four of the defendants were acquitted, one pleaded guilty, and Nix was convicted. To review the judgment of conviction, Nix sued out writ of error.

The essence of the charge is that defendants would form an unincorporated trust, to be known as the Eliasville Pool Syndicate No. 1, with a capital stock of $150,000, divided into 1,500 unit shares of a par value of $100; Nix to be sole trustee, and business to be commenced with an oil and gas lease for land in Texas. Defendants were to buy implements for drilling purposes from the Continental Oil & Gas Company of Texas, the implements to be disposed of to the trustee of the Duke of Dublin Oil Company of Texas at an increased price, without the knowledge of the unit holders of the syndicate. Defendants were to execute an assignment of the oil and gas lease in January, 1921, to the trustees of the Duke of Dublin Oil Company for $1, without the consent or knowledge of the holders of shares in the syndicate, and would thereby transfer the only assets of the syndicate, and leave it without assets, except the money derived from the sale of the units. Additional units were to be sold, and defendants were to make an amended declaration of trust in the office of the commissioner of corporations of California, and secure therefrom a permit for the sale of unit shares of the syndicate within California. Defendants were falsely to promise victims that the unit shares would be sold upon certain conditions and that they would abide by the conditions. A true copy of the permit was to be delivered to each prospective subscriber for units before any subscription or sale was to be made.

It is charged that the syndicate was to sell and issue unit shares, except treasury shares, in designated numbers, and to provide for funds to pay expenses contemplated in connection with the completion of the oil well, whereas defendants intended to cause the syndicate to sell and issue unit shares in greater amounts than authorized by permit, intending to convert to their own use all the proceeds derived from the sales. The sole promotion interest of the defendants in the syndicate was to consist of units remaining unsold and all moneys remaining upon the completion of the first well after payment of expenses; whereas, so it is charged, defendants intended to sell promotion units before completion of the first well, and prior to the payment of all expenses intended to appropriate the proceeds from the sale of such units. Part of the scheme was to pretend to victims that after January 5, 1921, and prior to May 11, 1922, the Eliasville Pool Syndicate owned the oil and gas lease referred to; whereas defendants knew that Nix, as trustee, on the 5th of January, 1921, assigned all the right, title, and interest he had under the lease to the Duke of Dublin Oil Company.

Other alleged false representations were with reference to the drilling of a well on the leased premises; also that the leased premises were less than a mile from certain designated wells, which had come in with a very large initial production of oil; that the leased premises of the syndicate were practically surrounded by big producing oil wells, whereas all such representations were false and known by defendants to be false; that the total amount of money realized from the sale of oil would be paid in monthly dividends to the unit holders, less 10 per cent. for the maintenance of the well of the syndicate; that a certain article of the amended declaration of trust filed with the corporation commissioner of California had been amended to the effect that 60,000 units should remain in the treasury for further development; that on May 17, 1922, the first well had been drilled to a depth of 2,940 feet; that on June 11, 1922, the said well had been drilled to a depth of 2,985 feet. These several representations are alleged to have been false and fraudulently made.

It is charged that, in carrying on the scheme, defendants mailed letters in which they referred to the Eliasville Pool Syndicate and to various matters connected therewith. In one letter, dated December 26, 1922, unit holders were told that the syndicate, Nix, trustee, were preparing to issue the first dividend and that checks were being prepared. In another letter, dated January 9, 1923, the first dividend check was inclosed, and the letter stated that other dividends would follow in the near future. A prospectus was mailed, in which there appeared a map of the Eliasville Pool Syndicate's lease of 30 acres.

W. I. Gilbert and Burton Briggs Crane, both of Los Angeles, Cal., for plaintiff in error.

Joseph C. Burke, U. S. Atty., of Los Angeles, Cal., and David V. Cahill and Maurice R. Norcop, Sp. Asst. Attys. Gen.

Before ROSS, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The main assignments of error present the question of the sufficiency of the evidence and of rulings upon the admission or rejection of testimony.

[1] It is unnecessary to detail at length the testimony that was introduced in support of the material allegations of the indictment. There was evidence to show that Nix, by himself and with others, formed the syndicate and acquired the 30-acre oil and gas lease, with the purpose of obtaining money from innocent purchasers of stock by means of willfully false and fraudulent representations, and to execute the scheme that he, or through others acting at his instigation and direction, mailed letters to various persons. By an assignment dated January 5, 1921, Nix transferred a twelve-sixteenths interest in the lease to secure a loan of $2,500. This fact he failed to disclose to shareholders, and after the assignment, and before May, 1922, he made sales of units of the syndicate upon the representation that he owned the lease, which in fact, with the tools (the only assets of the syndicate), were also pledged. Witnesses testified that Nix failed to show the permit he had obtained from the corporation commissioner of California in June, 1921, and which in express terms required that he exhibit and deliver a copy of such permit to each prospective purchaser of shares. Had he shown the permit, the prospective purchaser would have seen that Nix's promotion interest was to be large, and they would have read what limits were placed upon sales of units. The only well drilled was completed in November, 1922. Bills for work and materials aggregating $27,000 were not paid, and eventually the lease was sold at a bankrupt sale to King, a codefendant herein, who pleaded guilty.

The evidence is that representations by Nix and his associates, made prior to, May 1, 1922, that a well had been drilled 1,500 feet, were untrue. Only one dividend was paid, although between November, 1922, and April 15, 1923, Nix was paid about $29,000. It does not appear what became of this money. There was some oil production from the well, and Nix sold a quantity of oil for cash. Cash received from the sale of units amounted to $88,000, which with the $29,000 paid to Nix for oil, made a total of $117,000 which belonged to the syndicate. In a written statement dated November, 1922, Nix showed that $59,000 had been paid out for the syndicate and that $7,000 remained on hand, but there is no other statement of what money Nix may have paid for the benefit of the unit holders. The person who was hired as bookkeeper testified that there were no records in the office upon which to open books; that she asked Nix for the records, and, after saying he would produce accounts of disbursements, Nix failed to do so. Representations as to the depth of the well were false. For example, in April, 1922, Nix told a purchaser that the well was then 2,700 feet deep, whereas at that time the well was between 400 and 500 feet in depth.

[2] In respect to the use of the mails in executing the scheme, the evidence was ample to go to the jury. Some of the letters bore the signature of Nix as trustee. One was signed by Chambers, who was office manager of the syndicate in the absence of Nix. Another of the letters mailed was signed by the sales manager, who was working for Nix, selling units and raising money for the syndicate. As there is evidence tending to show that the last referred to letter was written and mailed at the instance of Nix, the fact that the employé who wrote the letter was found not guilty does not affect the question of the guilt of Nix.

King, a codefendant, who testified for the government, stated that by request of Nix he sent two kinds of telegrams, one advising Nix of actual facts, and the other containing misstatement of facts; the latter telegrams being sent with a view to inducing persons to buy shares. King also testified that Nix told him to send him telegrams to keep him "pepped up," the kind that he could "use in selling stock," and not to "wire any grief"; that upon one occasion Nix showed him $6,000 in cash and said he would give it to King to meet debts of the syndicate if King would make a false affidavit that the syndicate owed no debts; that Nix wanted the affidavit to file with the corporation commissioner of California. King also testified that he and Nix discussed "the advisability of using the Western Union, instead of using the mails, on account of sending such information through the mails." Defendants introduced no testimony.

[3] It is urged that some of the letters described in the indictment and signed by persons other than Nix were erroneously admitted as evidence against Nix. But before the trial ended counsel for the government offered them against all of the defendants, "subject, of course, to connection and

proof of a common scheme and concerted action in that scheme." The court ruled that they were admissible as against the particular defendants who signed them, and that if, at a later time, there was proof of a conspiracy, then they were admissible as against all. As the evidence tended strongly to show an unlawful combination to defraud, there was no error in the admission of the letters against Nix and such others as were found to be members of the combination. Furthermore, although the instructions were in no way excepted to, we have examined them and find that they carefully guarded the rights of the defendant Nix with respect to what his responsibility might be for the writing and mailing of the letters not signed or mailed by him.

There are many exceptions to the rulings of the trial court in admission of testimony, which in the development of the government's case at first may have seemed irrelevant, but which, as the case proceeded, became relevant and established the several elements of the offense charged.

We find no ground for reversal, and affirm the judgment.

Affirmed.